UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS UNION LOCAL NO. 710 PENSION FUND, and JAMES E. DAWES and NEAL J. LONDON, Trustees, AND THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS UNION LOCAL NO. 710 HEALTH & WELFARE FUND, and JAMES E. DAWES and NEAL J. LONDON, Trustees,<br><br>        Plaintiffs,<br><br>    v.<br><br>THE BANK OF NEW YORK MELLON CORPORATION, a Delaware Corporation,<br><br>        Defendant. | 13-cv-01844<br>The Honorable Charles Norgle<br><br>**Electronically filed** |

**DEFENDANT'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION TO DISMISS COMPLAINT WITH PREJUDICE**

Defendant The Bank of New York Mellon Corporation (the "Parent Corporation") respectfully submits this Memorandum of Law in support of its Motion to Dismiss the Complaint with Prejudice.

## PRELIMINARY STATEMENT

In their Complaint, Plaintiffs essentially allege that a subsidiary of the Parent Corporation should have foreseen the collapse of Lehman Brothers and sold A-rated Lehman bonds that it had purchased on Plaintiffs' behalves; these "hindsight is 20/20" allegations do not state plausible causes for wrongdoing, and should be dismissed.

Plaintiffs are large pension plans that wanted to extract additional income from their huge portfolio of investment securities by contracting with The Bank of New York Mellon (formerly known as The Bank of New York) ("BNY Mellon") to lend those securities to broker-dealers in

1

exchange for cash collateral, which Plaintiffs directed BNY Mellon to invest according to

Plaintiffs' specific guidelines. Plaintiffs and BNY Mellon then "split" the proceeds from those

investments, with Plaintiffs receiving 80% and BNY Mellon receiving 20%. These "securities

lending" arrangements were and are common among large institutional investors, including

pension plans governed by ERISA.

Plaintiffs complain about two investments that BNY Mellon made in notes issued by

Lehman Brothers ("Lehman"). Importantly, Plaintiffs do not allege that these investments

violated their guidelines, which specifically authorize investments in corporate notes like these

so long as they were rated "A" by Standard & Poor's or "A2" by Moody's. In fact, Plaintiffs

admit that these Lehman notes maintained these ratings (and all other guideline requirements) up

until Lehman filed for Chapter 11 bankruptcy protection on September 15, 2008. Plaintiffs also

do not allege that BNY Mellon's overall investment strategy was imprudent, or that it over-

allocated securities lending collateral investments to Lehman's securities, or that the fee

agreement was not the product of an arms-length negotiation or was for an unreasonable

amount.[1] Instead, Plaintiffs contend that BNY Mellon should have foreseen Lehman's fall and

sold the notes despite being in compliance with Plaintiffs' own guidelines, and that failure to do

so violated ERISA. For multiple reasons, Plaintiffs' Complaint fails to state a claim.

## THE ALLEGATIONS IN THE COMPLAINT

Plaintiffs' claims arise from a contract between Plaintiffs and BNY Mellon, pursuant to

which Plaintiffs became a lender in a securities lending program administered by BNY Mellon.

Cmpl. ¶¶ 34-40. Each of the Plaintiffs entered into a Securities Lending Agreement and

---

[1] *Cf. Diebold v. N. Trust Invs. N.A. and the N. Trust Co.*, No. 09-cv-1934, 2010 WL 3700387 (N.D. Ill. Sept. 7, 2010); *Diebold v. N. Trust Invs. N.A. and the N. Trust Co.*, 2012 WL 4017929, at *4 (N.D. Ill. Sept. 10, 2012) (J. Norgle) ( "Plaintiffs claim that the fees were unreasonable because, *inter alia*, Defendants set all of the terms and conditions between themselves and took forty percent of the net income from securities lending.")

Guaranty with BNY Mellon, on June 6, 2006 (the "Agreements"). *Id.* ¶ 34, Cmpl. Exs. A and B (the Agreements). BNY Mellon is a subsidiary of the Parent Corporation, but the latter is not a party to the Agreements. *See id.* ¶ 18, Cmpl. Exs. A and B. Under the Agreements, BNY Mellon agreed to act as Plaintiffs' agent to lend securities to approved borrowers, *id.*, and Plaintiffs directed BNY Mellon "to invest and reinvest all or substantially all of the Cash Collateral received in any Approved Investment," which were defined in Schedule I to the Agreements (the "Guidelines"). Cmpl. ¶¶ 35, 38, Cmpl. Exs. A and B. Plaintiffs recognized an inherent risk of investment loss and agreed that the "Funds bore the risk of any of the losses on any of the accounts' collateral investments." Cmpl. ¶ 40; Agreements, Art. IV.2. ("All approved investments shall be for the account and risk of Lender.") The Agreements reserve to Plaintiffs' Trustees the power to prohibit BNY Mellon from investing "with particular financial institutions or issuers" by delivering a written notice to BNY Mellon with appropriate instructions. Agreements, Art. IV.2(b). Plaintiffs never delivered such a written notice regarding Lehman.

The Guidelines include "high grade commercial paper, notes, bonds, and other debt obligations, . . . [which] may have fixed, floating, or variable rate interest payment provisions." Agreements, Schedule I. The Guidelines included maturity and credit rating limitations for the various categories of investments, but none of those limitations required credit ratings of greater than "A" by Standard & Poors or "A2" by Moody's so long as the securities matured within three years. *Id.* Schedule II to the Agreements, approved and signed by the Trustees on June 6, 2006, provides for the split of the investment revenue between Plaintiffs and BNY Mellon, with Plaintiffs receiving 80% of the revenue and BNY Mellon receiving the remaining 20% as a fee for its services (the "Fee Arrangement"). *Id.*, Schedule II.

The Complaint challenges the investment of Plaintiffs' collateral in two floating rate notes issued by Lehman Brothers bearing CUSIP numbers 52517PL33 and 52517PQ53 ("Lehman Notes"). Plaintiffs themselves admit that the Lehman Notes were rated "AA-" by Standard & Poors until June 2008 and "A" by S&P and "A2" by Moody's at the time of Lehman's bankruptcy filing. *See* Compl. ¶¶ 66, 77. Nor do Plaintiffs otherwise allege that the Lehman Notes violated the Trustees' Guidelines; instead, they merely generally allege that BNY Mellon "failed to invest the collateral in safe and prudent investments" and "maintained the collateral investments in highly risky investments." Cmpl. ¶ 98.[2]

## LEGAL STANDARD

A court should dismiss a complaint under Rule 12(b)(6) if it contains no more than "'naked assertion[s]' devoid of 'further factual enhancement,'" or if it is only "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Aschcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-557 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Likewise, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 1950 (citing Fed. R. Civ. P. 8(a)(2); internal quotations and alterations omitted). A plaintiff must provide the grounds upon which his claim rests through "factual allegations enough to raise a right to relief above the speculative level.'" *Twombly*, 550 U.S. at 555.

---

[2] The Guidelines provide that floating rate instruments rated "A" and "AA" shall have maturities "no greater than three years." Schedule I. The Lehman Note bearing CUSIP number 52517PL33 was issued on August 23, 2006 with a scheduled maturity of November 24, 2008, and the Lehman Note bearing CUSIP number 52517PQ53 was issued on December 18, 2006 with a scheduled maturity of December 23, 2008. *See* Exs. 1 and 2 (Pricing Supplements filed with SEC for the Lehman Notes). *Seidel v. Byron*, 405 B.R. 277, 284-285 (N.D. Ill. 2009) (SEC filings may be considered on a motion to dismiss).

## **ARGUMENT**

I.  **THE COURT SHOULD DISMISS THE COMPLAINT BECAUSE THE PARENT CORPORATION IS NEITHER A CONTRACTING PARTY NOR A FIDUCIARY.**

Plaintiffs sued the Parent Corporation, but that entity did not sign a contract with Plaintiffs and was not Plaintiffs' fiduciary, whether under ERISA or otherwise. The Parent Corporation is "a holding corporation that was created after the 2007 merger of Mellon Financial Corporation and The Bank of New York Company, Inc." Cmpl. ¶ 18. The Bank of New York Company, Inc. was a holding company and the parent company of The Bank of New York (now known as The Bank of New York Mellon), a subsidiary bank that ran the securities lending program in which Plaintiffs participated. *See* Ex. 3 (The Parent Corporation's 10-K for fiscal year ended Dec. 31, 2007), p. 3. After the 2007 merger, the Parent Corporation became the parent company to BNY Mellon. *See* Ex. 4 (The Corporation's 10-K for fiscal year ended Dec. 31, 2012), p. 4.

The Agreements and the rights and duties thereunder are the basis for the fiduciary duty that Plaintiffs allege to have existed: "***Pursuant to the Agreements***, BNY Mellon agreed to act as an agent and ***a fiduciary*** for the Local 710 Funds, who granted BNY Mellon sole discretion to loan securities" and invest cash collateral. Cmpl. ¶ 5 (emphasis added). Because the Parent Corporation is not a party to the Agreements and because Plaintiffs make no plausible factual allegations that the Parent Corporation acted as their fiduciary, there is no basis for finding a fiduciary relationship between the Parent Corporation and the Plaintiffs.

In ERISA cases, "'the threshold question is … whether the person [or entity] was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint.'" *Mugnai v. Kirk Corp.*, 843 F. Supp. 2d 858, 870 (N.D. Ill. 2012) (quoting *Pegram v. Herdich*, 530 U.S. 211, 226 (2000)). ERISA Section 3(21)(A)(i) provides that a person or

entity is a plan fiduciary to the extent he "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets…." 29 U.S.C. § 1002(21)(A)(i). "[T]he question of whether [an entity] is a fiduciary within the meaning of ERISA . . . is a question of law" and is appropriate for determination at the motion to dismiss stage. *United Indep. Flight Officers, Inc. v. United Air Lines, Inc.*, 756 F.2d 1262, 1266 n. 6 (7th Cir. 1985); *see generally, Mugnai*, 843 F. Supp. 2d 858 (dismissing ERISA claims against trustees where plaintiffs did not allege facts sufficient to show that the trustees were fiduciaries under ERISA); *Plumb v. Fluid Pump Service, Inc.*, No. 94 C 6252, 1995 WL 324557, at *3-4 (N.D. Ill. May 26, 1995), *aff'd in part, vacated in part*, 142 F.3d 849 (7th Cir. 1997) (dismissing fiduciary duties claims where the complaint did not sufficiently allege defendants were fiduciaries as to the particular matters complained of).

The Parent Corporation's ownership of BNY Mellon alone cannot justify conferring fiduciary status upon the Parent Corporation. *See Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, No. 09-C-5619, 2010 WL 3940694, at *7-8 (N.D. Ill. Oct. 6, 2010) (dismissing ERISA claims against the parent corporation of a fiduciary subsidiary where the complaint lacked factual allegations that the parent had total control over the fiduciary subsidiary or other involvement in the challenged conduct); *see also U.S. v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation [ ] is not liable for the acts of its subsidiaries.") (internal quotation omitted). In *Peabody v. Davis*, the court held that a parent corporation of a fiduciary subsidiary could not be held liable under ERISA, even though the parent and the subsidiary were closely held corporations controlled by the same individuals and the parent corporation had some technical control over the plan assets. No. 05-C-5026, 2009 WL 2916824, at *14 (N.D. Ill. Sept. 2, 2009)

*aff'd in part, rev'd in part*, 636 F.3d 368 (7th Cir. 2010). The court reasoned that the

"determination of whether a given individual or entity was acting as a fiduciary for ERISA

purposes centers on the question of discretion," and since plaintiff failed to show that the parent

corporation had any real discretionary authority, there was insufficient basis to find that the

parent corporation was a fiduciary to the Plan. *Id.* The same is true here, and, therefore, the

Complaint must be dismissed.

## II.    COUNT I OF THE COMPLAINT, CHALLENGING THE PRUDENCE OF THE LEHMAN INVESTMENT UNDER ERISA § 404, FAILS TO STATE A CLAIM.

ERISA's prudence standard does not depend upon the ultimate outcome of an

investment, but upon the prudence of the fiduciaries under the circumstances prevailing when

they make their decision and in light of the alternatives available to them. *DeBruyne v. Equit.*

*Life Assur. Soc. of U.S.*, 720 F. Supp. 1342, 1348 (N.D. Ill. 1989). "When deciding whether a

plan fiduciary has acted prudently, a court must ask whether the fiduciaries employed a reasoned

decisionmaking process at the time they engaged in the challenged transactions." *George v.*

*Kraft Foods Global, Inc.*, 684 F. Supp. 2d 992, 1008 (N.D. Ill. 2010), *aff'd in part, rev'd in part*,

641 F.3d 786 (7th Cir. 2011) (internal quotations omitted); *see also Pension Ben. Guar. Corp.*

*ex. rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d

705, 2013 WL 1296481, at *6 (2d Cir. 2013) ("St. Vincent") (The prudent person standard under

ERISA "'focus[es] on a fiduciary's conduct in arriving at an investment decision, not on its

results, and ask[s] whether a fiduciary employed the appropriate methods to investigate and

determine the merits of a particular investment.'") (quoting *In re Unisys Sav. Plan Litig.*, 74 F.3d

420, 434 (3d Cir. 1996)).

The Complaint does not allege that BNY Mellon failed to conduct "a reasoned decision-

making process" to invest in or to hold the Lehman Notes, which complied with the Guidelines

up to the time of Lehman's bankruptcy. Rather, the Complaint relies on various supposed "red flags" that allegedly should have caused BNY Mellon to make a different investment decision. The Second Circuit recently rejected this type of "red flag" argument as insufficient to state a claim, *see St. Vincent*, 2013 WL 1296481, at *10,[3] and the Seventh Circuit has made clear that "ERISA's fiduciary duty of care requires prudence, not prescience." *Keach v. U.S. Trust Co.*, 419 F.3d 626, 638 (7th Cir. 2005) (internal quotations omitted). The Complaint's allegations concerning the prudence of investing in and holding the Lehman Notes rests on two categories of alleged facts: (1) public statements about the housing market and subprime mortgages generally in 2007 and 2008, Cmpl. ¶¶50-58, along with "public and industry speculation on the future of Lehman", *id.* ¶¶ 59-78, and (2) excerpts from the Lehman Bankruptcy Examiner's Report that allegedly show certain knowledge and actions by the private side of BNY Mellon's business, *id.* ¶¶ 81-87. Neither is enough (separately or together) to support a claim of imprudence.

### A. Public Documents Cited in the Complaint Do Not Give Rise To An Inference of Imprudence.

The cherry-picked news articles, analyst reports, and "public and industry speculation" fail to raise a plausible inference that BNY Mellon's decisions to invest in and hold the Lehman Notes were not based on a reasoned decision-making process or "that an adequate investigation would have revealed to a reasonable fiduciary that the investment was improvident." *St. Vincent*, 2013 WL 1296481, at *8. In *St. Vincent*, the Second Circuit recently dismissed claims alleging that Morgan Stanley breached its fiduciary duties under ERISA by investing and maintaining plan assets in subprime mortgage-backed securities. *Id.* at *10. Similar to here, the claims in *St.*

---

[3] Plaintiffs may cite to a securities lending complaint against BNY Mellon that survived summary judgment, *The Bd. of Trs. of the So. Cal. IBEW-NECA Defined Contribution Plan v. The Bank of New York Mellon Corp., et al.*, No. 09 Civ. 6273, 2010 WL (S.D.N.Y. Sept. 7, 2010). However, that opinion was before *St. Vincent* held (and explained) that generalized pleading of "warning signs" was insufficient to state a claim, *St. Vincent*, 712 F.3d 705 (2d Cir. 2013), and was based on alleged facts not found here.

*Vincent* rested on "warning signs" that plaintiff alleged should have caused Morgan Stanley to reduce its exposure to mortgage-backed securities, specifically (1) that issuers of the securities held by the plan disclosed large losses owing to their own exposure to subprime mortgage backed securities, (2) analyst predictions that Morgan Stanley's parent company would have to write down $6 billion on the value of its subprime mortgage-backed securities, and (3) rating downgrades on mortgage-backed securities that were less risky than subprime mortgage-backed securities. *Id.* The Second Circuit held that none of the warning signs gave rise to a plausible inference that Morgan Stanley knew, or should have known, that the investments were risky or that Morgan Stanley breached its duty by not selling those investments. *Id.*

> Rather than alleging any factual matter about how a prudent investor would have viewed the Portfolio's securities at the relevant times, and in the relevant circumstances … the Amended Complaint alleges imprudence by association, reasoning that because the Portfolio contained nonagency mortgage-backed securities—of which subprime mortgage-backed securities are now the most infamous type—and because the whole world knows (in hindsight) that many subprime mortgages turned out to be disastrous investments, the Portfolio's concentration in mortgage-backed securities generally and nonagency securities in particular was imprudent.

*Id.* at *12. The amended complaint "fail[ed] to connect the alleged 'warning signs' to any specific characteristics of the securities in the Portfolio." *Id.* at *11; *see also In re Huntington Bancshares Inc. ERISA Litig.*, 620 F. Supp. 2d 842, 852 (S.D. Ohio 2009) (allegations citing to news articles and other documents that discussed the United States housing market and mortgage foreclosures insufficient to put defendants on notice or to trigger a duty to investigate the offering of a company's stock who had exposure to the subprime market).

That is precisely the case here. The allegations citing news articles and other documents about the housing and credit crisis in general, Cmpl. ¶¶ 50-58, are not connected to any specific characteristics of the Lehman Notes and cannot give rise to a plausible inference that those particular investments were too risky. The same is true of the "Public And Industry Speculation

On The Future of Lehman" cited by Plaintiffs. It is only with the benefit of hindsight that Lehman's default can be predicted from the public and industry documents cited in the Complaint. Moreover, it is a completely undefined sampling of reports and "speculation." No facts are pled from which it could be ascertained whether these were, for instance, majority or minority opinions. Simply identifying a number of negative news reports or opinions without any description or analysis of the overall universe of such information does not lead to any reasonable inference as to overall market sentiment, much less that holding the particular Lehman Notes was imprudent. This is particularly true given that the price of the Lehman Notes, according to the Complaint, "was trading at close to par" even days before Lehman filed for bankruptcy in the early morning hours of September 15, Cmpl. ¶¶ 69, 76, indicating that the sum of such market information and opinion was that the Lehman Notes were safe and the market viewed the risk of default as extremely low. Indeed, Lehman's credit ratings remained higher than credit ratings allowed in the Guidelines at all times prior to the bankruptcy filing. *Id.* ¶ 77. "The relevant pleading standards do not permit such general accusations of imprudence, unsupported by well-pleaded factual allegations." *St. Vincent*, 2013 WL 1296481, at *12.

## B.   Allegations Based on the Lehman Bankruptcy Examiner's Report Cannot Give Rise to An Inference of Imprudence.

The Complaint also alleges, relying on the Lehman Bankruptcy Examiner's Report (the "Report'), that BNY Mellon's knowledge and actions as a clearing agent for Lehman is evidence of BNY Mellon's breach of fiduciary duty. Cmpl. ¶¶ 81-86. However, the allegations say *nothing* about how BNY Mellon analyzed or viewed the Lehman Notes and, in any event, its knowledge and actions as a clearing agent cannot, as a matter of law, give rise to a reasonable inference that BNY Mellon failed to conduct a reasoned inquiry in connection with the purchase or holding of the Lehman Notes.

10

Even taken as true, the allegations regarding the Report merely say that BNY Mellon as clearing agent sought collateral to support Lehman's intraday credit. There are no allegations that BNY Mellon stopped providing credit, or viewed the Lehman Notes as in danger of default, let alone that BNY Mellon believed that Lehman was about to file for bankruptcy protection. There is no plausible or logical connection between the statements in the Report and any alleged ERISA violations regarding the Lehman Notes.

Nor is it plausible that BNY Mellon could use inside information gained as Lehman's clearing bank in order to benefit either itself or Plaintiffs. A financial institution like BNY Mellon is required to set up a firewall to ensure that its businesses that receive private, non-public information do not use that information in its businesses that engage in trading, such as securities lending. *See In re Enron Corp. Secs, Derivatives., & ERISA Litig.*, 235 F.Supp.2d 549, 688 (S.D. Tex. 2002) (financial institutions permitted to offer investment banking and commercial services when Chinese Wall was established between the two). This firewall between the public and private sides of BNY Mellon is required by law to prevent trading based on non-public information. Securities Exchange Act of 1934, Section 15(g) (codified at 15 U.S.C. §78o(g)). Consequently, allegations of what the private side of BNY Mellon knew and did cannot support an inference that the public side's investing decisions were imprudent. Courts have recognized this separation of information and held that, for the purposes of an ERISA breach of fiduciary duty claim, an ERISA fiduciary is not required to make investment decisions based on non-public inside information in violation of federal securities laws. *See White v. Marshall & Ilsley Corp.*, 714 F.3d 980, 2013 WL 1688918, at *11 (7th Cir. 2013) (affirming rejection of imprudence claim that "would require insiders to engage in investment transactions on the basis of material nonpublic information, which would violate federal

securities laws"); *see also Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1282 (11th Cir. 2012) (affirming rejection of fiduciary loyalty claim because "[j]ust as plan participants have no right to insist that fiduciaries be corporate insiders, they have no right to insist that fiduciaries who are corporate insiders use inside information to the advantage of the participants.").

### C. The Complaint Does Not Adequately Plead That BNY Mellon Violated a Duty of Loyalty.

In addition to the prudence claim, the Complaint contains allegations that BNY Mellon breached its duty of loyalty by purchasing the Lehman Notes on Plaintiffs' behalf.  Cmpl. ¶¶ 102-105.  This is not a case where there are allegations that the fiduciary invested in an affiliated entity or an entity or fund in which it had an ownership interest.  This is also not a case where there are factual allegations that the fiduciary stood to make more money from the investment than it would have in other similar investments.  Rather, the claim appears to be either purely derivative of the imprudent investment claim or based on the Fee Arrangement structure itself, which the parties agreed to as a result of an arms-length negotiation and in a non-fiduciary capacity.  Cmpl. ¶¶ 40, 104.  The entry and establishment of the Fee Arrangement cannot constitute a breach of fiduciary duty because BNY Mellon owed Plaintiffs no such duty with respect to the negotiation of their Fee Arrangement.  *See Shulist v. Blue Cross of Iowa*, 717 F.2d 1127, 1131-1132 (7th Cir. 1983) (holding that Blue Cross was not a fiduciary under ERISA with respect to its selection as a hospital service provider to the Plan or the rate of compensation it received, and thus it could not be held liable under ERISA for alleged unreasonable compensation received under the contract).  Plaintiffs do not allege that they were coerced to enter the Fee Arrangement or that BNY Mellon was somehow acting as a fiduciary when Plaintiffs and BNY Mellon agreed to the Fee Arrangement.

12

Plaintiffs also do not allege that the *amount* of the fee is somehow improper. The Complaint also does not plead any change in the Fee Agreement or its reasonableness over time. The Complaint does not allege any basis by which the Fee Arrangement applies any differently to the purchase of the Lehman Notes than the myriad other investments made by BNY Mellon for Plaintiffs since the inception of their participation in securities lending in 2006, which Plaintiffs do not claim to be breaches of loyalty. The only difference is, in hindsight, the outcome of the different investments. In short, Plaintiffs have failed to plead facts, as opposed to conclusory assertions, sufficient to establish that the Fee Arrangement constituted a breach of the duty of loyalty.[4]

Further, because the breach of loyalty claim is based on the Fee Arrangement, it is barred by the statute of limitations. *See* 29 U.S.C. § 1113 (requiring actions to be filed within "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation"). The Complaint admits that the Trustees executed the Agreements (containing the Fee Arrangement) on June 6, 2006, and do not allege that it changed. Cmpl. ¶ 34. Again, this is not a case where Plaintiffs challenge the amount or reasonableness of the fee where underlying facts need to be parsed; rather, they claim (seemingly) that the structure of the Fee Arrangement itself creates divergent interests and thereby constitutes a breach of loyalty. Thus, because the

---

[4] To the extent that the breach of loyalty claim is based on buying or maintaining the Lehman Notes, then that claim is barred for the same reasons the prudence claim fails. *See In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 953, 968-69 (E.D. Wisc. 2009) ("Under the circumstances, the complaint fails to state a claim that the defendants breached their fiduciary duties under 29 U.S.C. § 1104(a) by not managing the Plans in the best interests of the participants as discussed above. Consequently, related and derivative allegations of breach of a duty of loyalty, duty to monitor and investigate, co-fiduciary liability, and knowing breach of fiduciary duty (Counts II through VI) fail as a matter of law.") (citing *In re RadioShack Corp. ERISA Litig.*, 547 F. Supp. 2d 606, 616 (N.D. Tex. 2008) (same); *Smith v. Delta Air Lines, Inc.*, 422 F. Supp. 2d 1310, 1333-34 (N.D. Ga. 2006) (same); *Edgar v. Avaya, Inc.*, No. 05-3598, 2006 WL 1084087, *11 (D.N.J. April 25, 2006) (same), *aff'd*, 503 F.3d 340 (3d Cir. 2007).); *see also Brown v. Medtronic*, 628 F.3d 451, 461 (8th Cir. 2010) (same). To the extent the claim is based on BNY Mellon's motive in buying the Lehman Notes, such allegations are wholly conclusory. Cmpl. ¶¶ 102-03.

structure of the Fee Arrangement (and therefore any breach based thereon) is self-evident from

the face of the Agreements, Plaintiffs had actual knowledge of the breach of fiduciary duty that

they claim no later than June 6, 2006. *See* Agreements, Schedule II. Accordingly, the statute of

limitations on the duty of loyalty claim expired prior to the start of the tolling period. *See* Cmpl.

¶ 92 ("The Local 710 Funds' ERISA claims were tolled per *American Pipe* from July 13, 2009

through and including August 16, 2012.").

## III.  THE COMPLAINT FAILS TO STATE A CLAIM UNDER ERISA SECTION 406.

In Count Two, the Complaint conclusorily alleges that BNY Mellon violated ERISA

Section 406 because it "dealt with the collateral, assets of [Plaintiffs], in its own interest or for its

own account in that it invested [Plaintiffs'] collateral in the Lehman Notes for the express

purpose of making investments for BNY Mellon's own financial benefit and earning profits for

itself and at the expense of [Plaintiffs]…" Cmpl. ¶ 110. The Complaint alleges that BNY

Mellon had a duty under ERISA Section 406(b)(1) which generally prohibits a fiduciary from

"deal[ing] with the assets of the plan in his own interest or for his own account." *Id.* ¶ 44.

The charging of a fee for services provided, however, does not constitute dealing with the

assets of the plan in his own interest or for his own account. Moreover, Count II also fails to

state a claim for all of the reasons that the breach of loyalty claim fails to state a claim. The

Complaint contains no factual allegations with respect to its ERISA Section 406 claim except for

the structure of the Fee Arrangement set forth in Schedule II of the Agreements and the

assignment of reinvestment risk to Plaintiffs in the Agreements. Cmpl. ¶ 40; Cmpl. Exs. A and

B. As with the alleged breach of a duty of loyalty, discussed in Section II.C, *infra,* this sole

factual allegation is insufficient to support the reasonable inference that BNY Mellon dealt with

the assets of the plan for its own interest or its own accounts when it purchased the Lehman

14

Notes or that the Fee Arrangement itself violates ERISA Section 406(b)(1). Finally, as with the

ERISA Section 404 breach of loyalty claims, Plaintiffs' claims based on ERISA Section 406 is

barred by the statute of limitations for the same reasons. *See* Section II.C, *infra*.

## CONCLUSION

For the foregoing reasons, The Corporation respectfully requests that this Court dismiss

the Complaint with prejudice.

Dated: June 7, 2013  
      Chicago, Illinois

Respectfully submitted,  
/s/ Debra Bogo-Ernst  
Debra Bogo-Ernst  
MAYER BROWN  
71 South Wacker Drive  
Chicago, Illinois 60606  
Tel: (312) 782-0600, Fax: (312) 701-7711  
dernst@mayerbrown.com

Robin A. Henry (*pro hac vice* pending)  
BOIES, SCHILLER & FLEXNER LLP  
333 Main Street  
Armonk, New York  
Tel: (914) 749-8200, Fax: (914) 749-8300  
rhenry@bsfllp.com

W. Todd Thomas (*pro hac vice* pending)  
BOIES, SCHILLER & FLEXNER LLP  
401 East Las Olas Blvd. Suite 1200  
Fort Lauderdale, Florida 33301  
Tel: 954-356-0011, Fax: (954) 356-0022  
tthomas@bsfllp.com

Rosaline Y. Chan (*pro hac vice* pending)  
BOIES, SCHILLER & FLEXNER LLP  
575 Lexington Avenue  
New York, New York 10022  
Tel.: (212) 446-2300, Fax: (212) 446-2350  
rchan@bsfllp.com

*Attorneys for Defendant The Bank of New York Mellon Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2013, I electronically filed the foregoing with the Clerk of the Court for the United States District Court, Northern District of Illinois by using the CM/EF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/EF system.

Dated: June 7, 2013
       Chicago, Illinois

Respectfully submitted,

/s/ Debra Bogo-Ernst
Debra Bogo-Ernst
MAYER BROWN
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 782-0600, Fax: (312) 701-7711
dernst@mayerbrown.com