UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

-------------------------------------------------------------------X

THE INTERNATIONAL BROTHERHOOD OF    :
TEAMSTERS UNION LOCAL NO. 710    :
PENSION FUND, and JAMES E. DAWES and    :   **Civ. Action No. 13-cv-1844**
NEAL J. LONDON, Trustees, AND    :
THE INTERNATIONAL BROTHERHOOD OF    :   **JUDGE NORGLE**
TEAMSTERS UNION LOCAL NO. 710    :
HEALTH & WELFARE FUND, and JAMES    :   **MAGISTRATE JUDGE GILBERT**
E. DAWES and NEAL J. LONDON, Trustees,    :

  :

           Plaintiffs,    :   **FIRST AMENDED COMPLAINT**

  :

     v.    :   **JURY TRIAL DEMANDED**

  :

THE BANK OF NEW YORK MELLON    :
CORPORATION, a Delaware corporation, and THE    :
BANK OF NEW YORK MELLON (f/k/a THE BANK    :
OF NEW YORK),    :

  :

          Defendants.    :

-------------------------------------------------------------------X

       Plaintiffs The International Brotherhood of Teamsters Union Local No. 710 Pension Fund (the "Local 710 Pension Fund") and The International Brotherhood of Teamsters Union Local No. 710 Health & Welfare Fund (the "Local 710 Health & Welfare Fund") (together, "Plaintiffs," the "Local 710 Funds" or the "Funds"), and James E. Dawes and Neal J. London, Trustees of the Local 710 Funds, by their undersigned attorneys, for their complaint against defendants The Bank of New York Mellon Corporation ("BNY Mellon Corp.") and The Bank of New York Mellon, formerly known as The Bank of New York ("BNY" and, together with BNY Mellon Corp., "Defendants") respectfully allege as follows based upon their own knowledge as to themselves and upon information and belief as to others:

## NATURE OF THE CLAIMS

1.      Defendants comprise a sophisticated financial institution.  They claim to be the global leader in the securities lending business, with "credit expertise in the Securities Industry that is second to none."  They have long run one of the largest securities lending programs in the world.

2.      Defendants touted to the Local 710 Funds that their securities lending program is a "Flexible and custom-tailored program related to lending, investing and reporting" that is "First call for many borrowers."  They further boasted that, due to their "Strong credit/risk control culture," "Active asset and liability management approach," and conservative investment strategy, their securities lending program was very low risk.  Indeed, in 2006, Defendants proclaimed to the Funds: "No Client Loss in 28 Year History."

3.      The Local 710 Funds exist to pay the benefits that their thousands of active members, pensioners and benefits recipients have earned.  The assets of the Funds provide the means to pay these benefits.

4.      In 2006, Defendants solicited the Local 710 Funds to participate in their securities lending program.  Based on Defendants' representations, the Local 710 Funds agreed to participate in the program.  At all relevant times, Defendants touted that the program was safe and low risk and could be used to generate incremental revenue on securities held in Defendants' custody to offset Defendants' custodial fees.  Indeed, given this modest goal, Defendants promised that investments pursued in the securities lending program were designed to be low-yielding and nearly riskless.

5.      Each of the Local 710 Funds subsequently executed a Securities Lending Agreement and Guaranty (together, the "Agreements") with BNY.  Pursuant to the Agreements,

BNY agreed to act as an agent and a fiduciary for the Local 710 Funds, who granted BNY sole discretion to loan securities from their portfolios held in custody with Defendants to appropriate third-party borrowers (such as broker-dealers) in exchange for collateral in the form of cash or equivalents. Defendants, as the Local 710 Funds' fiduciary, agreed to utilize their discretion in accord with the Funds' investment goals and risk profile to invest the cash collateral posted by the third-party borrowers in order to return the investment income to the Local 710 Funds. BNY Mellon Corp., through its division BNY Mellon Asset Servicing, managed the Funds' cash investments at issue herein.

6.      Because of this relationship, Defendants owed fiduciary duties to the Local 710 Funds under the Employee Retirement Income Security Act of 1974 ("ERISA") to act prudently with regard to the investments they made for the Funds with the securities lending cash collateral.

7.      In late 2006, Defendants used the securities lending cash collateral held for the Local 710 Funds to purchase nearly $25 million of corporate floating rate notes issued by Lehman Brothers Holding Company, Inc. ("Lehman"). The value of these notes (the "Lehman Notes") subsequently plunged dramatically when Lehman filed for bankruptcy on September 15, 2008.

8.      As the Funds have learned through the independent investigation conducted by the Examiner appointed by the Bankruptcy Court overseeing Lehman's bankruptcy, BNY, by virtue of its position as one of Lehman's clearing banks, had knowledge of Lehman's deteriorating financial condition prior to Lehman's bankruptcy. Further, as stated in the Examiner's Report filed with the Bankruptcy Court, BNY took steps to protect its own interests.

9.    Indeed, Defendants' knowledge of Lehman's vulnerabilities mirrored the voluminous and increasingly troubling flood of industry and media reports describing Lehman's deteriorating financial condition in 2007 and 2008.

10.    Yet, despite Defendants' specific knowledge and recognition of the growing risks to Lehman's viability – and, necessarily, the risks to investments in Lehman such as the Lehman Notes – and despite the multiple industry and media reports speculating about Lehman's future in 2007 and 2008, Defendants failed to do anything with respect to the Funds' investment in the Lehman Notes to eliminate or minimize the losses that ultimately materialized when Lehman declared bankruptcy. Instead, Defendants simply held the Lehman Notes and idly watched as Lehman defaulted on its obligations, even though they could have sold the Lehman Notes at any point prior to the default in 2008, which would have significantly minimized or eliminated any losses. Defendants were in essence gambling with the Funds' money for which they bore no risk of loss.

11.    The mere hint of Lehman's financial struggles and possible default should have caused Defendants to sell the Lehman Notes. The Funds' securities lending accounts were supposed to be invested in extremely low risk, conservative investments. Accordingly, Defendants' speculative bet that Lehman would survive and not default was wholly improper, especially when Defendants had significant concerns about Lehman's financial stability and future. Perhaps a speculative bet on Lehman's survival would have been appropriate for a hedge fund with an aggressive and speculative risk profile, but securities lending accounts such as the Funds' accounts, by their very nature, require a cautious and conservative approach.

12.    Defendants' gamble of holding onto the Lehman Notes violated the Agreements and Defendants' fiduciary duties under ERISA. In particular, Defendants violated their duties

by: (i) failing to adhere to the key objective of safety of principal being paramount over all other considerations; (ii) imprudently maintaining the investments in Lehman despite growing uncertainty over Lehman's financial stability; (iii) imprudently maintaining the Lehman Notes, despite their knowledge of Lehman's deteriorating financial condition and while taking steps to protect their own exposure to Lehman; (iv) failing to manage the portfolio appropriately; and (v) acting in their own self-interest by failing to modify their risky investment strategy because they reaped much of the profits but risked none of the losses.

13.    Defendants' misconduct caused the Funds substantial losses, including the loss of principal and all historic revenues that would have been earned but for their misconduct. Defendants' acts and omissions are breaches of fiduciary duty under ERISA § 404(a) and are prohibited transactions that violate ERISA § 406, which entitles the Funds, pursuant to ERISA § 502(a)(2), to recover appropriate relief under ERISA § 409.

## PARTIES

### A.    Plaintiffs – The Local 710 Funds

14.    The Local 710 Pension Fund was established on February 1, 1955.  It has 6,550 active participants, 10,550 pensioners, and 4,600 terminated vested participants.

15.    The Local 710 Health & Welfare Fund was established on January 25, 1950. It has 2,700 participants.

16.    The Funds exist to pay the benefits that their members and participants have earned.  The assets of the Funds provide the means to pay these benefits.

17.    The Local 710 Funds are located at 9000 West 187th Street, Mokena, Illinois, 60448.

18.     James E. Dawes and Neal J. London are two of the six trustees of the Funds who run the Funds' business and affairs and who appear in this lawsuit in their representative capacities as trustees for the Funds.

**B.     Defendants**

19.     Defendant BNY is a New York state-chartered bank, which is headquartered and has its principal place of business in New York, New York.  BNY is a subsidiary bank of The Bank of New York Mellon Corporation, a holding corporation that was created after the 2007 merger of Mellon Financial Corporation and The Bank of New York Company, Inc.

20.     The Bank of New York became The Bank of New York Mellon on July 1, 2008, when The Bank of New York Mellon Corporation completed the process of consolidating and renaming its principal U.S. bank and trust company subsidiaries.  The Bank of New York Mellon is the successor by operation of law to The Bank of New York, the entity that executed the Agreements with the Local 710 Funds.  Throughout this Complaint, references to BNY refer to both The Bank of New York Mellon and its predecessor, The Bank of New York (which existed until July 1, 2008).

21.     Defendant BNY Mellon Corp. is a Delaware corporation and a global financial services company headquartered in New York City, New York, which was established in 2007 following the merger of Mellon Financial Corporation and The Bank of New York Company, Inc.  BNY Corp. is a holding company for its two banks, The Bank of New York Mellon, National Association and The Bank of New York Mellon (*i.e.*, BNY).

22.     At relevant times, Defendants operated one of the largest securities lending programs in the world, with $3.3 trillion in lendable assets and more than $330 billion daily

outstanding loans. Defendants' lending program included six regional trading desks, with over 300 employees worldwide.

23.  Defendants acted on behalf of the Local 710 Funds in a variety of capacities, including, but not limited to, acting as a custodial bank for the Local 710 Funds' securities portfolio, acting as an agent and fiduciary in connection with the lending of the Funds' securities, and acting as an agent, fiduciary, and investment manager in connection with the investment of collateral received through the lending of the Local 710 Funds' securities.

## JURISDICTION AND VENUE

24.  Plaintiffs seek relief for the Funds pursuant to the civil enforcement mechanisms provided by ERISA against fiduciaries pursuant to §§ 404 and 406 (29 U.S.C. §§ 1104, 1106) and the remedies provided by §§ 409 and 502(a)  (29 U.S.C. §§ 1109, 1132).  This Court has exclusive jurisdiction over this action and Defendants pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1) (29 U.S.C. § 1132(e)(1)).  This Court also has jurisdiction under 28 U.S.C. § 1332 as Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

25.  Venue is proper in the Northern District of Illinois pursuant to ERISA § 502(e)(2) (29 U.S.C. § 1132(e)(2)) and  28 U.S.C. § 1391(b)(1) and because BNY agreed to venue in this District in the Agreements.

## GENERAL ALLEGATIONS

A.    **Defendants' Securities Lending Program**

26.  Securities lending, in its most basic form, is the practice of temporarily loaning a security from an institutional investor's portfolio to another entity.  In exchange, the lender of the security receives collateral from the borrower, usually in the form of cash, which can then be

invested by the lender's agent – usually a bank – until the security is required to be returned. Borrowers typically include broker-dealers and hedge funds, which use borrowed securities, *inter alia*, to cover short sales, satisfy securities deliveries, and to hedge positions. For the lender, the purpose of participating in a securities lending program – as explained by Defendants – is to generate *incremental revenue* on securities that are being held in a custodial account through the investment of the collateral received from the borrower. Securities lending accounts are not intended to provide significant investment returns typically affiliated with speculative investment strategies.

27.     A securities lending program involves several parties: a securities lender, a borrower, and an agent who facilitates the transactions. The agent, such as Defendants here, performs multiple functions on behalf of the securities lender. For example, the agent is responsible for loan origination, locating credit-worthy borrowers, and collecting and managing the collateral received on the securities loans. One of its duties is to exercise discretion to invest and manage the collateral on behalf of the lender.

28.     Because a securities borrower is entitled to the return of its collateral upon repayment of the securities loan, it is critically important that the collateral investments be considerably low risk and highly liquid so that the lender can readily return the entire collateral amount to the borrower. The timing of the return of lent securities is highly unpredictable, and, as such, it is necessary for the collateral to be invested in short-term, liquid instruments. As is the case here, it is the lender (here, the Local 710 Funds) – not the agent – that bears the risk of a decline in value of the collateral through investment losses.

29.     The value of the collateral is also important because the lender is exposed to counterparty risk, in that the borrower could default on its securities loan. The collateral is intended to be sufficient to protect against such defaults.

30.     Defendants represented that they would use their experience and expertise to manage the program to ensure that their lending clients are protected. For example, the materials stated that Defendants have a "Strong credit/risk control culture," and that they take an "Active asset and liability management approach" to the program.

31.     Defendants told the Funds that their securities lending program was conservatively run and that their team had experienced nearly three decades of uninterrupted positive income, with no losses. Defendants touted that they were "a uniquely positioned major Wall Street clearance bank with credit expertise in the Securities Industry that is second to none." They further proclaimed that they had "[a]ctive asset and liability management-experience in managing separate collateral account structures" like the Local 710 Funds' account. Defendants further assured the Funds that they were "experienced in adhering to Client's program parameters" and that they performed "[r]igorous and comprehensive oversight of [the securities lending] program."

32.     Based on this supposed hands-on, conservative approach in 2006, Defendants, in soliciting the Local 710 Funds to participate in the securities lending program, boasted that they had not suffered a client loss in the program's 28-year history.

33.     Moreover, as late as 2009, Defendants' own website emphasized their conservative approach to the securities lending program, acknowledging the program's aim of providing a "steady return while focusing upon the preservation of principal, interest rate sensitivity and credit risk" by "maintaining a prudent level of liquidity, implementing policies

and procedures to monitor and control our investment guidelines, monitoring the quality of our issuers, and performing regularly scheduled tests to identify the interest rate sensitivity of our investment portfolio."

34.     Defendants recommended the program as a safe and conservative way to generate modest incremental income from the Local 710 Funds' securities holdings held in custody with Defendants. As described by Defendants, this incremental income could be used to offset fees charged by Defendants for custodial services on the Funds' securities portfolio.

35.     Defendants described their securities lending program as having the equivalent risk and return profile as a money market account. As described, the program fit within the Local 710 Funds' own conservative investment profile – which focused on the preservation of principal as the most important investment objective.

**B.     The Local 710 Funds' Securities Lending Agreements With BNY**

36.     In reliance on Defendants' representations, on or about June 6, 2006, the Funds executed the Agreements with BNY. (True and correct copies of the Agreements are attached hereto as Exhibits A and B.)

37.     Under the terms of the Agreements, the Funds appointed BNY as their agent with full discretion "to lend Securities in the Account to Borrowers from time to time." (Exs. A and B at Article II(1).) As agent for the Funds, BNY had sole and full discretion to lend securities owned by the Funds to approved creditworthy borrowers pursuant to a securities borrowing agreement. These borrowers typically needed the securities for their own short term market-making or arbitrage purposes.

38.     In order to protect the Funds' securities from a borrower's default, the Agreements required borrowers to post collateral as security for the return of the loaned

securities. Borrowers were required to post collateral that, at all times, had a market value equal to 102% of the then current market value of the loaned securities. If the market value of the collateral received from the borrower fell below the 102% collateral requirement, the Agreements required BNY to demand additional collateral from the borrower in order to assure the market value of the collateral was never less than the collateral requirement. (*See* Exs. A and B at Article IV(1).)

39.     Under the Agreements, BNY would be responsible for replacing any loaned securities that were not returned by a borrower (*e.g.* in the event of a borrower's default). (*See* Exs. A and B at Article IV(5).) Pursuant to the collateral requirement, borrowers provided the collateral to BNY, as agent for the Funds, as security for the loaned securities. BNY, as agent for the Funds, held the collateral in approved collateral accounts. (*See* Exs. A and B at Article IV(2)(a).)

40.     Pursuant to the Agreements, BNY was to use its discretion to invest and manage the collateral received from the borrowers of the securities pursuant to certain investment criteria set forth in an Approved Investments schedule, which was appended to the Agreements. (*See* Exs. A and B at Article IV(2).) BNY Mellon Corp., through its division BNY Mellon Asset Servicing, actually managed the investments.

41.     The Approved Investments reflect the Local 710 Funds' concern for preserving principal, limiting exposure to losses, and maintaining high liquidity. For example, the Approved Investments include typically low-yielding but secure products like government bonds, high-grade commercial paper, notes, bonds, and CDs. The Approved Investments also included specific credit criteria for any bank or corporate obligations, requiring that such obligations be rated "at least A-1 (by Standard & Poor's) or P-1 (by Moody's)" if short term (12

months or less) or A, A2 if long term (over 12 months) by Standard & Poor's or Moody's, respectively.

42.    The Agreements further provided that the Funds bore the risk of any of the losses on any of the accounts' collateral investments. Moreover, although Defendants would not share in this risk, they would receive 20% of all earnings on the investments in the accounts. (*See* Exs. A and B at Article IV(2)(c), Article V(8), and Schedule II.) Thus, with no downside and 20% of the upside, Defendants were incentivized to invest in order to generate greater revenues for their own benefit.

## C.    Defendants Owe Fiduciary Duties To The Funds Under ERISA

43.    Defendants are fiduciaries in that they exercised authority or control over the management or disposition of the assets of the Funds.

44.    Defendants are also fiduciaries in their capacity as investment manager of the Funds' assets in the securities lending program, as defined by ERISA, 29 U.S.C. § 1002(38). Defendants managed, acquired, and disposed of the Funds' assets in its administration of the Funds' securities lending portfolio. Additionally, Defendants qualify as a banking institution organized under the laws of the United States in accordance with the Investment Advisors Act of 1940.

45.    Pursuant to ERISA § 404(a)(1) (29 U.S.C. § 1104(a)(1)), Defendants had the following duties:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A) for the exclusive purpose of:
>
> > (i)    providing benefits to participants and their beneficiaries; and

      (ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

46. Defendants also had the duty to refrain from engaging in prohibited transactions. Section 406(b)(1) of ERISA (29 U.S.C. § 1106(b)(1)) titled "[t]ransactions between plan and fiduciary" provides, in pertinent part, that:

A fiduciary with respect to a plan shall not –

(1) deal with the assets of the plan in his own interest or for his own account.

47. Under this statute, Defendants had a duty to act prudently by employing proper methods to investigate, evaluate and structure investments made with the collateral received by the Funds.

48. In addition, Defendants were required to exercise independent judgment when making investment decisions. Blanket reliance upon the ratings issued by ratings agencies does not suffice as such independent judgment.

49. Furthermore, Defendants' responsibilities with respect to the investments made with the Funds' collateral do not terminate upon the decision to invest. Defendants' fiduciary duties under ERISA are continuous, and, accordingly, Defendants have an ongoing duty to

monitor the investments made with the Funds' collateral with reasonable diligence and to dispose of any inappropriate investments.

**D.      The Lehman Notes**

50.     As the Funds' investment manager and fiduciary, Defendants made various investments with the Funds' collateral.  In August 2006 and then again in December 2006, Defendants, as the Funds' agent and fiduciary, invested $24.5 million of the cash collateral received by the Funds in floating rate notes issued by Lehman.  These Lehman Notes bore the CUSIP numbers 52517PL33 and 52517PQ53.

51.     When Lehman filed for bankruptcy on September 15, 2008, the Funds' collateral accounts had $24.5 million face value of Lehman Notes.  As a result of the default, a $24.5 million deficiency was booked into the Funds' collateral accounts by Defendants.  Although distributions from the Lehman bankruptcy estate and sales of the Lehman Notes have subsequently reduced the deficiency, the Funds still suffered a significant loss, amounting to many millions more than the Funds' revenues earned by participating in BNY's securities lending program.

**E.      The Onslaught Of The Housing And Credit Crises**

52.     Between February and April 2007, the subprime mortgage industry collapsed, spurring several of the largest subprime mortgage lenders in the country to file for bankruptcy. On February 5, Mortgage Lenders Network USA Inc., the 15th largest subprime mortgage lender in the country, filed for bankruptcy.  On April 2, New Century Financial, the largest subprime lender in the country, filed for bankruptcy.  On February 13, 2007, *The Wall Street Journal* reported that "the rising inability of subprime-mortgage borrowers to meet their payments amid

higher interest rates has caused sharp spikes in the ABX index, the derivative index tracking subprime mortgages, as well as individual asset-backed derivatives . . . ."

53.     On June 1, 2007, S&P and Moody's downgraded over 100 bonds backed by second-lien subprime mortgages. On July 31, 2007, S&P placed 612 asset-backed securities backed by subprime residential mortgages on credit watch.

54.     At the beginning of August 2007, American Home Mortgage Investment Corporation, the second largest subprime mortgage lender in the U.S., filed for bankruptcy. Shortly thereafter, after announcing that foreclosures and mortgage delinquencies had risen to their highest levels since early 2002, Countrywide Financial Corporation, the biggest U.S. mortgage lender, narrowly skirted bankruptcy through an emergency loan of $11.5 billion from a group of banks. On August 31, 2007, Ameriquest Mortgage Co., another of the largest mortgage lenders in the country, announced that it was closing its doors.

55.     On October 16, 2007, in a speech in Washington, U.S. Treasury Secretary Hank Paulson expressed alarm about the burgeoning financial crisis, proclaiming that "the housing decline is still unfolding and I view it as the most significant risk to our economy." Paulson also warned against relying on rating agency ratings, and called for more scrutiny of rating agencies in view of the failures related to mortgage-backed securities.

56.     Things only got worse. In January of 2008, the National Association of Realtors announced that 2007 had resulted in the largest drop in existing home sales in 25 years, and that the industry had experienced "the first price decline in many, many years and possibly going back to the Great Depression." *See* Grynbaum, Michael, "Home Prices Fell in '07 for the First Time in Decades," *N.Y. Times* (Jan. 24, 2008).

57.     On March 17, 2008, JP Morgan Chase announced that, to prevent a total collapse of Bear Stearns, the nation's fifth largest investment bank, it would purchase the company at a price of $2 per share (which was subsequently revised to $10 per share). This price was less than 2% of Bear Stearns' 52-week high of $133.20 per share.

58.     In mid-July of 2008, IndyMac Bank, a subsidiary of Independent National Mortgage Corporation, was placed into the receivership of the FDIC by the U.S. Office of Thrift Supervision. IndyMac Bank was one of the largest financial institution failures in U.S. history.

59.     Moreover, by mid-July, Bloomberg reported that banks and brokers had suffered more than $435 billion of write-downs and credit losses related to mortgage-backed securities, CDOs, leveraged loans, and other fixed-income assets since the beginning of 2007. Fineman, Josh & Keoun, Bradley, "Merrill Lynch Posts Fourth Straight Quarterly Loss (Update 2)," *Bloomberg News* (July 17, 2008).

60.     On September 7, 2008, the Federal government took control of Fannie Mae and Freddie Mac, which owned or guaranteed about half of the country's $12 trillion mortgage market. The takeover resulted in widespread panic amongst bankers and mortgage lenders.

**F.     Public And Industry Speculation On The Uncertain Viability Of Lehman**

61.     Unknown to the Funds, but known to Defendants, Lehman's core businesses were severely impacted by the collapse of the housing markets and the spreading credit crisis in late 2007 and early 2008 described above, leading to intense speculation on Lehman's future. As a result of this speculation, Defendants should have, at that time, considered the Lehman Notes an improper investment for the ultra-conservative risk profile of the Funds' securities lending accounts, and removed the Lehman Notes from such accounts.

62.     For example, on December 14, 2007, Punk Ziegel & Co. issued an analyst report,

rating Lehman a "sell" and stating that:

> I have raised the Lehman estimates slightly but they are still well below
> street consensus. Moreover, I do not expect 2009 earnings to be as high as
> 2007 earnings for this company. The target price on the stock has been
> lowered despite this adjustment in the estimate to reflect the fact that the
> multiple on this stock is declining in response to a murkier outlook.
>
> Balance sheet re-engineering is not the core of this company. Operating
> businesses are. ***The outlook for these businesses is not positive.
> Therefore, even though this is one of the most impressive companies in
> the financial sector, its stock should be avoided.***

(emphasis added.)

63.     On March 17, 2008, Bear Stearns, the fifth-largest U.S. investment bank, was sold

to JPMorgan Chase "for the investment-banking equivalent of pocket change," *Business Week*

reported the day after the collapse. The same article stated that the takeover was causing Wall

Street to worry "that the high-stakes game of dice the big firms were playing with asset-backed

securities of dubious quality may force more players to exit the table."

64.     The Bear Sterns collapse raised numerous red flags as to the soundness of

maintaining an investment in Lehman. To this end, on March 17, 2008, the *Dow Jones*

*Newswires* published a column entitled "IN THE MONEY: Why Lehman May or May Not Be

The Next Bear." This article stated in pertinent part:

> There are a number of reasons to think Lehman Brothers Holdings Inc.
> (LEH) won't be the next Bear Stearns Cos. (BSC) - but at least one big
> reason to think it might.
>
> ***Lehman's stock tumbled 19% Monday to its lowest level in years, on
> investor concern that the liquidity crisis that nearly wiped out Bear
> might strike Lehman or another big investment bank next.*** The firm
> roundly denied it had anything resembling a liquidity problem, but then so
> did Bear, just days before it almost collapsed and was forced to accept a
> takeover by JPMorgan Chase & Co. (JPM) at a tiny fraction of its book
> value.

\*      \*      \*

> *But there's at least one reason for concern: Lehman has sizable exposure to dicey mortgage securities and other hard-to-value instruments that could be a drag on its liquidity. That same issue contributed to the problems at Bear.*

> But then there's the mortgage issue. As of the end of its fiscal year in November, Lehman held *$42 billion worth of "Level 3" securities - illiquid, write-down-prone* securities valued using Lehman's estimates and models instead of actual market data. Of that amount, $25.2 billion are mortgage and asset-backed securities, making them even dicier.

> The $42 billion amounts to 14.4% of Lehman's total financial instruments, and about 1.9 times the company's entire shareholder equity. Bear had even higher exposure by some measures, but Lehman's is significant.

(emphasis added.)

65.    Also, on March 17, 2008, the *Dow Jones Business News* published an article entitled "Moody's Cautions On Outlook For Lehman; Shares Poised to Fall." This article states in pertinent part:

> Earlier Monday, Moody's said that it affirmed its Al rating on the senior long-term debt of Lehman Brothers (LEH) but lowered its outlook on Lehman ratings to stable from positive.

\*      \*      \*

> "However, these conditions have decreased the upward pressure on Lehman's rating, and therefore a positive outlook is no longer warranted," the ratings agency said.

66.    On March 28, 2008, *The Huffington Post* published an article entitled "Is Lehman Next?" that questioned the "possibility that Lehman will face a run like the one that brought down Bear Stearns." The article reported that the market's "concerns were intensified when UBS downgraded Lehman stock to neutral from buy . . . and analysts at ING speculated that Lehman may not play a big enough role in the markets to justify a Fed-backed bailout like the one at Bear Stearns."

67.     On May 28, 2008, as reported by *Bloomberg News*, David Einhorn, president and co-founder of hedge fund Greenlight Capital Inc., stated, "We are nowhere near the end of the contraction that left Lehman with about $3 billion of write downs and losses in the past year." Einhorn further stated, "Lehman is undercapitalized. They continued doubling down as the credit crisis evolved." Fineman, Josh & Schaffler, Rhonda, "Lehman Remains 'Undercapitalized,' Einhorn Says," *Bloomberg News*, May 28, 2008.

68.     Although the Funds did not know it at the time, on or about June 2, 2008, S&P downgraded its credit rating of the Lehman Notes from A+ to A. Defendants knew or should have known of this downgrade and the increased risks of holding the Lehman Notes.

69.     Nor did the Funds know that on June 9, 2008, Fitch downgraded its credit rating of the Lehman bonds to AA- from A+ or that same day, Moody's changed its rating outlook on Lehman from stable to negative. Defendants knew or should have known of these downgrades and the increased risks of holding the Lehman Notes.

70.     On June 9, 2008, Lehman announced a second-quarter loss of $2.8 billion, far higher than analysts had expected. The company said it would seek to raise $6 billion in fresh capital from investors. Shortly thereafter, Lehman's CFO, Erin Callan, and COO, Joseph Gregory, both resigned. By the end of July, unknown to the Funds, Lehman's stock price had dropped to less than $17 per share – reflecting a total drop of more than 70% in the first seven months of 2008.

71.     Notably, however as of July 2008, the Lehman Notes were still trading at close to par, so Defendants could have liquidated the Funds' Lehman holdings at little, if any, loss. By this time, the meager returns from holding these bonds in no way matched the escalating risk of holding them. Indeed, because even a modicum of heightened risk was inappropriate for the

Funds' securities lending accounts, Defendants should have sold the Lehman Notes. Nevertheless, even though Defendants knew or should have known of this risk, they did nothing to remove this risk from the Funds' cash collateral portfolio.

72.     By late August 2008, it was publicly reported that Lehman, "whose market capitalization has dwindled to about $11 billion, owns about $61 billion in mortgages and asset-backed securities." Anderson, Jenny & Dash, Eric, "For Lehman, More Cuts and Anxiety," *N.Y. Times* (Aug. 28, 2008); *see also* Anderson, Jenny, "Burdened By Mortgages, Lehman's Options Narrow," *N.Y. Times* (Aug. 21, 2008) ("Lehman has remained in the center of the storm because of its smaller size, its significant mortgage exposure – about $61 billion in mortgages and asset-backed securities – and its seeming reluctance to take drastic steps . . . . About 40 percent of the securities packaged and sold by Lehman with subprime mortgages from 2006 are delinquent.").

73.     As Defendants knew or should have known, the cost of Lehman credit default swaps for one-year notes rose from $6 to $144 in 2007 and then, for the first eight months of 2008, experienced a five-fold increase in price to about $700, thus illustrating for investment professionals the rising risk of investing in Lehman debt. The Funds were unaware of this rising risk.

74.     Lehman's situation grew even more dire as the markets reflected uncertainty as to whether the U.S. government would bail out Lehman, which was further exacerbated by the government's takeover of Fannie Mae and Freddie Mac in early September. *See* Anderson, Jenny & White, Ben, "Wall Street's Fears on Lehman Bros. Batter Markets," *N.Y. Times* (Sept. 9, 2008).

75.     On September 9, 2008, after it was reported that a state-run South Korean firm had put on hold its talks to acquire all or part of Lehman, Lehman's stock lost roughly half its

value as its shares plunged 45% to $7.79 in one day. The same day, S&P issued a negative watch on Lehman.

76.     On September 10, 2008, Lehman reported its worst quarterly loss ever. Lehman lost $3.9 billion during the third quarter of 2008, due to $7.8 billion in credit-related write-downs, including $5.3 billion on residential mortgage related positions. Lehman's stock fell another 7% after the announcement.

77.     On September 10, 2008, Moody's placed Lehman on review with direction "uncertain," reflecting the deterioration of Lehman's situation. Moody's noted in the September 10 rating action "that should a strategic arrangement fail to materialize in the near term, Lehman's ratings would be downgraded, likely into the Baa category, with the ratings continuing on review for possible downgrade."

78.     Even on that late date, Defendants could have liquidated The Local 710 Funds' holdings of Lehman bonds and received close to par value, and avoided losses The Local 710 Funds have suffered after Lehman declared bankruptcy.

79.     On September 15, 2008, Lehman filed for bankruptcy. The same day, Moody's downgraded Lehman's senior long term debt rating to B3 from A2, cutting its rating by 10 notches, deep into "junk" status. Also on September 15, S&P downgraded Lehman to CCC- (with a negative watch) from A, and Fitch Ratings downgraded Lehman to default. The price of Lehman bonds plunged to 32% of par value and by September 18, 2008, the price had fallen further to 15% of par value.

80.     Due to Defendants' purchase of the Lehman Notes, and their subsequent failure to sell them prior to Lehman bankruptcy, the Funds have suffered losses.

81.     In sum, Lehman's financial and business distress was the subject of a litany of news reports and financial analyses prior to its filing for bankruptcy. In the two years prior to Lehman's demise, the sheer volume and gravity of these news reports should have compelled any reasonable securities lending fiduciary to sell notes issued by Lehman; the suggestion that Lehman was imperiled rendered investments in it entirely inappropriate for the Funds' securities lending accounts.

82.     Defendants' failure to do so demonstrates that it either negligently, recklessly, or willfully failed to conduct a reasonable inquiry into the continued suitability of the Lehman Notes for the Funds and/or that its internal processes and procedures in place to manage the investments made in securities lending accounts, like those of the Funds, was deficient.

**G.     Defendants Were Concerned About Lehman's Ability To Survive And Acted For Their Own Benefit**

83.     Defendants' failure as the Funds' fiduciary is not limited to a willful or reckless disregard of the news concerning Lehman's financial distress. In addition, unbeknownst to the Funds, Defendants had significant internal concerns about Lehman's viability, and, on information and belief, acted to limit their own exposure to Lehman.

**1.     Prior To Lehman's 2008 Bankruptcy, Defendants Had Removed Lehman From Their List of Approved Borrowers**

84.     Pursuant to the Agreements, BNY was only permitted to loan securities to institutions on the bank's "Approved Borrowers" list. This list was comprised of entities that Defendants had determined to be sufficiently creditworthy for the purpose of borrowing securities from Defendants' securities lending clients.

85.     On information and belief, and unbeknownst to the Funds, Defendants had removed Lehman from this Approved Borrowers' list many months prior to Lehman's ultimate

demise. Likewise, a September 15, 2008 press release issued by Defendants makes clear that they had eliminated any of their own exposure to Lehman by the time of the bankruptcy filing.

86. Notwithstanding Defendants' conclusion that Lehman was no longer a worthy borrower of securities in the securities lending program, Defendants continued to hold the Lehman Notes on behalf of the Funds.

87. Defendants' conduct is notable because, as discussed above, while they were financially responsible for a borrower's failure to return borrowed securities, only the lender – *i.e.*, the Funds – bore the risk of a decrease in value of the collateral held in exchange for such borrowed securities. (*See* Exs. A and B at Article IV(2)(c), Article V(8), and Schedule II.) In other words, by removing Lehman from the list of Approved Borrowers and, yet, keeping the Funds invested with Lehman, Defendants implicitly made the determination that Lehman was too risky a counterparty for Defendants, but not for their securities lending clients like the Funds – regardless of the fact that Defendants had marketed the securities lending program as being conservatively run and that the Funds' investment profile focuses on the preservation of principal as the most important investment objective.

**2. Defendants Conceal Their Dealings With Lehman And Their Own Concerns About Lehman's Survival From The Local 710 Funds**

88. Following Lehman's bankruptcy filing, the Funds began to independently investigate the circumstances surrounding Defendants' investment of the Funds' collateral in the Lehman Notes. As they did prior to Lehman's bankruptcy, Defendants concealed from the Local 710 Funds their relationships with Lehman, their concerns over Lehman's financial future, and their own efforts to protect themselves in the event of a default by Lehman. Defendants further refused to describe to the Funds or provide information about what credit analysis, if any, they

had performed on Lehman and when it was performed or provide any information about their own dealings with Lehman and any insights gained therefrom.

89.     In fact, in the wake of Lehman's bankruptcy, Defendants repeatedly assured the Funds that they had acted appropriately in maintaining the investments in the Lehman Notes.

### 3. The Lehman Bankruptcy Examiners' Report Reveals That BNY, As Lehman's Clearing Bank, Was Acutely Aware Of Lehman's True Financial Peril

90.     On March 11, 2010, the Report filed by the Examiner in connection with the Lehman bankruptcy proceeding was made publicly available.[1]  This Report provided a first glimpse into the information that Defendants had concealed from the Funds regarding Defendants' relationships with Lehman and Defendants' true knowledge as to Lehman's financial uncertainty in the days and months leading up to Lehman's filing for Chapter 11 bankruptcy protection on September 15, 2008.  Among other things, the Report revealed that BNY served as one of Lehman's clearing banks for its myriad daily trades.  In that capacity, BNY was uniquely positioned to understand Lehman's financial instability.

91.     As set out in the Report, in order to broker the numerous trades that comprised its daily operations, Lehman relied upon intraday credit advanced by at least six clearing banks, including BNY, that it used to facilitate these trades.  Lehman's clearing banks were key to its viability.  They served as intermediaries between Lehman and all of the counterparties to its various securities trades, essentially playing matchmaker between buyer and seller.  Each clearing bank had its own specialties in certain types of trades, so Lehman utilized a variety of clearing banks – and the intraday credit they extended – to effectuate its panoply of securities trades.

---

[1]     The Examiner's Report is available at http://jenner.com/lehman/.

92. However, as the Report makes clear, beginning in March 2008, following the near collapse of Bear Sterns, counterparties and clearing banks became increasingly skeptical of Lehman's ability to maintain the *status quo* of its operations. The firm was widely-considered particularly vulnerable, due to its large leverage ratios and real-estate heavy balance sheet. Indeed, as revealed by the Report, by the summer of 2008, JPMorgan, Citibank, Bank of America, HSBC, and BNY had begun demanding collateral deposits in order to secure intraday credit risk. Up to this point, BNY had simply executed Lehman's trades on credit without fear of Lehman faltering on its obligations. But in light of Lehman's worsening financial condition, along with the market's obvious concerns, BNY now required Lehman to make these collateral deposits in order to continue doing business as usual.

93. The Report states that on August 20, 2008, BNY initiated discussions with Lehman about minimizing its exposure to Lehman's European commercial paper and medium term note programs. BNY eventually permitted Lehman to open a money market account with BNY to maintain a sufficient deposit to cover the bank's forecasted intraday exposure to Lehman. On September 11, 2008, BNY received an initial deposit of $125 million from Lehman with the understanding that Lehman would maintain at least $50 million in the account from that point forward. BNY held $170 million in collateral on the day Lehman filed for bankruptcy.

94. As one of the only approximately six clearing banks demanding collateral deposits, according to the Report, BNY was uniquely aware of the risks inherent in Lehman's operations. BNY's awareness and deep concern as to Lehman's uncertain financial condition is evidenced by its attempt to limit its Lehman exposure by demanding a $125 million collateral deposit from Lehman in the days leading up to the bankruptcy.

95.     As revealed by the Report, BNY sought to limit its own exposure to Lehman, but it failed to do anything to reduce the Local 710 Funds' exposure to Lehman. Indeed, on September 11, 2008, the day on which BNY demanded $125 million from Lehman, the Lehman Notes had a market price of 99.23 and 98.72 per $100 of par according to information provided by Lehman to the Funds in December 2009. If Defendants had also taken the prudent action of divesting the Lehman Notes on September 11, 2008 from the Local 710 Funds' collateral accounts, the Local 710 Funds' losses would have been significantly minimized.

96.     The Report thus revealed, for the first time, that Defendants had breached their duties owed to the Funds. Indeed, the information revealed by the Report was exactly the type of information the Local 710 Funds sought, but never received, from Defendants following Lehman's bankruptcy.[2] Until the Report was published, the Funds had trusted Defendants' comments that they had properly evaluated Lehman and had prudently managed and monitored the Funds' investments in the Lehman Notes. Defendants had knowledge of Lehman's deteriorating financial condition prior to the bankruptcy resulting from their direct dealings with Lehman, but while Defendants took steps to protect their own interests, they did nothing to protect the Funds.

### 4. Defendants Breached Their Fiduciary Duties By Investing The Funds' Assets In Lehman For The Bank's Own Benefit

97.     As discussed above, Defendants received 20% of all earnings on the re-investment of collateral held in the Funds' securities lending accounts while bearing no downside risk in the event the investments using such collateral declined in value.

---

[2]     For example, in correspondence dated September 29, 2009, the Funds sought "financial reports from BNY Mellon that may have provided [BNY Mellon] with knowledge of Lehman Brother's deteriorating financial condition in advance to the company's plunge into bankruptcy."

98.     While this arrangement incentivized Defendants to invest the collateral held for the Funds in higher yielding (and riskier) investments, such incentive should have been tempered by Defendants' fiduciary duty to the Funds. Thus, so long as Defendants were properly acting as the Funds' fiduciary by acting solely in their best interests, the 20% fees were not problematic.

99.     However, Defendants violated their duty of loyalty by investing the Funds' assets in the Lehman Notes even though shorter term, less risky, and lower yielding investments were available.     In doing so, Defendants impermissibly placed their own profit motives (*i.e.,* heightened fees) ahead of the Funds' interest in principle preservation.

## TOLLING PURSUANT TO THE *AMERICAN PIPE* DOCTRINE

100.     Under *American Pipe & Construction Co. v. Utah*, the filing of a class action tolls a statute of limitations for all members of the purported class until the class certification issue is resolved or a member opts out the class. *American Pipe & Const. Co. v. Utah*, 414 U.S. 538 (1974). Following *American Pipe*, and its progeny, class action tolling applies to "all asserted members" who later file actions of their own.

101.     The Local 710 Funds were members of the proposed class in *Board of Trustees of the Southern California IBEW-NECA Defined Contribution Plan v. Bank of New York Mellon Corp.*, No. 09 Civ. 6273 (RMB) (S.D.N.Y.) (the "IBEW Litigation" ). The IBEW Litigation was filed on July 13, 2009.

102.     The purported class in that case was "all trustees, administrators, and other fiduciaries of retirement plans who, pursuant to the [securities lending agreements] with BNY, held an interest in a Collateral Account that invested in a Lehman [floating rate note] through September 15, 2008" and included Lehman notes with the CUSIP numbers 52517PL33 and

52517PQ53. The purported class, as defined in the IBEW Litigation, included the Local 710 Funds as members.

103. The plaintiffs' class certification motion in the IBEW Litigation was denied on August 16, 2012.

104. The Local 710 Funds' ERISA claims were tolled per *American Pipe* from July 13, 2009 through and including August 16, 2012.

## COUNT I
### Violation of ERISA § 404 (29 U.S.C. §1104)

105. Plaintiffs repeat and reallege the allegations contained in paragraphs 1-104 as if fully set forth herein.

106. At all relevant times, Defendants acted as a fiduciary within the meaning of ERISA § 3(21)(A) (29 U.S.C. § 1002(21)(A)) by exercising authority or control with respect to the management or disposition of the collateral, the Funds' assets. Defendants also acted as an investment manager as defined by ERISA § 3(38) (29 U.S.C. § 1002(38)). Defendants acknowledged that they exercised discretionary authority over such assets.

107. Defendants had a duty to invest the collateral prudently based on the standards of a reasonably prudent fiduciary.

108. Defendants had a duty of loyalty to invest the collateral solely in the exclusive interests of the Funds and their participants and beneficiaries and for the exclusive purpose of providing retirement benefits to the Funds' participants and beneficiaries.

109. Defendants also had a duty to monitor the collateral investments continuously to ensure that they were at all times proper investments for the Funds given their investment profile and goals. Thus, if a collateral investment became imprudent or improper or excessively risky for the Funds, Defendants had a duty to act in order to protect the Funds.

110.    Defendants failed to invest the collateral in safe and prudent investments.  Instead, Defendants maintained the collateral investments in highly risky investments.

111.    Defendants failed to monitor the collateral investments to ensure they were at all times proper investments and, therefore, improperly maintained the imprudent Lehman Notes as collateral investments.

112.    Given the volume of news and first-hand knowledge of Lehman's financial distress, no reasonably prudent securities lending fiduciary would have concluded that Lehman debt was a sufficiently safe investment for a securities lending client and no reasonably prudent securities lending fiduciary would have maintained the collateral investments in the Lehman Notes through Lehman's bankruptcy filing.

113.    Defendants' failure to invest the collateral in a prudent manner constitutes, pursuant to ERISA § 404(a)(1), a breach of their fiduciary duty of prudence.

114.    Moreover, Defendants' actions were designed to increase profits earned by Defendants from securities lending in disregard of the risk of losses that could be suffered by the Funds.

115.    Defendants favored their own interests in gambling to make profits without any reasonable regard to losses that could be suffered by the Funds.

116.    Defendants earned substantial fees and profits as a result of action in their own self interest.

117.    By employing its "heads I win, tails you lose" investment strategy that was highly risky to the Funds for its own benefit, Defendants violated the duty of loyalty under ERISA § 404(a)(1).

118.    Accordingly, Defendants are liable under ERISA § 409, which provides:

[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

119.    Defendants are also liable under ERISA § 502(a)(2) to restore to the Funds all losses due to Defendants' breaches, as well as any profits that would have been earned had the collateral been prudently invested.

## COUNT II
## Violation of ERISA § 406 (29 U.S.C. § 1106)

120.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1-119 as if fully set forth herein.

121.    At all relevant times, Defendants acted as a fiduciary within the meaning of ERISA § 3(21)(A) (29 U.S.C. § 1002(21)(A)) by exercising authority or control concerning the management or disposition of the collateral, of the Funds' assets. Defendants also acted as an investment manager as defined by ERISA § 3(38) (29 U.S.C. § 1002(38)).

122.    Defendants dealt with the collateral assets of the Funds, in their own interest or for their own account in that they invested the Funds' collateral in the Lehman Notes for the express purpose of making investments for Defendants' own financial benefit and earning profits for themselves and at the expense of the Funds in violation of ERISA § 406.

123.    In particular, Defendants improperly invested the Funds' securities lending assets in the Lehman Notes because such investments were more profitable for Defendants as compared to other available investments better suited to the Funds' securities lending portfolio. In doing so, Defendants placed their own profit motives ahead of the security and safety of the Funds' assets.

124. These violations of ERISA § 406, along with the acts, transactions and courses of conduct alleged herein, caused losses to the Funds.

125. Therefore, under ERISA §§ 409(a) and 502(a)(2) (29 U.S.C. §§ 1109(a) and 1132(a)(2)), Defendants are required to pay damages to the Funds.

## PRAYER FOR RELIEF

WHEREFORE, the Funds demand judgment in the Funds' favor and against BNY and BNY Mellon Corp., jointly and severally, as follows:

A. Declaring that Defendants' conduct complained of herein was in violation of its fiduciary duties;

B. Declaring that Defendants have engaged in prohibited transactions in violation of ERISA § 406;

C. Issuing an order, pursuant to ERISA §§ 409(a) and 502(a)(2), compelling disgorgement and/or restitution and all other remedial relief as the Court may deem appropriate;

D. Ordering Defendants to pay the Local 710 Funds such damages as the Funds sustained as a result of Defendants' misconduct, including losses and lost revenues and profits, and damages based on the profits Defendants earned from their improper investments of the collateral;

E. Awarding attorneys' fees pursuant to ERISA § 502(g) (29 U.S.C. § 1132(g)) and/or other applicable authority; and

F. Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.


Dated: June 27, 2013

Lisa C. Cohen lcohen@schlaw.com*
Andrew J. Melnick amelnick@schlaw.com*
Mathew Katz mkatz@schlaw.com*
SCHINDLER COHEN & HOCHMAN LLP
100 Wall Street, 15th Floor
New York, New York 10005
Tel: (212) 277-6300
Fax: (212) 277-6333
*Admitted *pro hac vice*

(IL ARDC# 1047558)
Asher, Gittler Greenfield
Local Counsel for I. B. of T. Union
Local No. 710 Pension Fund and I.B.
of T. Union Local 710 Health & Welfare Fund
200 W. Jackson Blvd., Ste. 1900
Chicago, IL 60606
rbg@ulaw.com

David A. Sawyer dasawyer13@msn.com
Paul M. Newcomer pmnewcomer@msn.com
LAW OFFICES OF RUSSELL N. LUPLOW
185 Oakland Ave., Ste. 200
Birmingham, MI 48009
Tel.: (248) 644 8666