UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE INTERNATIONAL BROTHERHOOD ) <br> OF TEAMSTERS UNION LOCAL NO. 710 ) <br> PENSION FUND, and JAMES E. DAWES and ) <br> NEAL J. LONDON, Trustees, and THE ) <br> INTERNATIONAL BROTHERHOOD OF ) <br> TEAMSTERS UNION LOCAL NO. 710 ) <br> HEALTH & WELFARE FUND, and JAMES ) <br> E. DAWES and NEAL J. LONDON, Trustees, ) <br>   ) <br> Plaintiffs, ) <br>   ) <br> v. ) <br>   ) <br> THE BANK OF NEW YORK MELLON ) <br> CORPORATION, a Delaware Corporation, ) <br> and THE BANK OF NEW YORK MELLON ) <br> (f/k/a THE BANK OF NEW YORK), ) <br>   ) <br> Defendants. ) | No. 13 C 1844 <br><br> Judge Sara L. Ellis |

## OPINION AND ORDER

Plaintiffs the International Brotherhood of Teamsters Union Local No. 710 Pension Fund (the "Local 710 Pension Fund"), the International Brotherhood of Teamsters Union Local No. 710 Health & Welfare Fund (the "Local 710 Health & Welfare Fund," and, collectively with the Local 710 Pension Fund, the "Funds"), and James E. Dawes and Neal J. London, trustees of the Funds, filed a first amended complaint under the Employee Retirement Income Security Act ("ERISA"), codified at 29 U.S.C. § 1001 *et seq.*, against defendants the Bank of New York Mellon Corporation ("BNY Mellon Corp.") and the Bank of New York Mellon ("BNY").[1] The Funds bring claims for breach of the duties of prudence and loyalty in violation of ERISA § 404, 29 U.S.C. § 1104, and for violation of ERISA § 406, 29 U.S.C. § 1106. Before the Court is

---

[1] BNY is a subsidiary of BNY Mellon Corp., a holding corporation that was formed after the 2007 merger of Mellon Financial Corporation and the Bank of New York Company, Inc.

Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, Defendants' motion [26] is denied.

## BACKGROUND[2]

In 2006, Defendants, global leaders in securities lending, solicited the Funds, which maintain a conservative investment profile focused on the preservation of principal, to participate in Defendants' securities lending program. Briefly, securities lending involves the provision of temporary loans of security from an institutional investor's portfolio to another entity in exchange for collateral, usually in the form of cash. The collateral is then invested in short-term, liquid instruments until the security is returned. This arrangement generates incremental revenue on securities being held in custodial accounts for the institutional investor and is not intended to provide the types of significant investment returns typically associated with speculative investment strategies.

To convince the Funds to participate, Defendants touted the program's flexibility, conservative investment strategy, and low risk. They emphasized that no client had experienced any losses in the program's twenty-eight-year history and that Defendants were "a uniquely positioned major Wall Street clearance bank with credit expertise in the Securities Industry that is second to none." First Am. Compl. ¶ 31. Based on Defendants' representations, the Funds agreed to participate in the program and executed Securities Lending Agreements and Guaranties (the "Agreements") with BNY on or about June 6, 2006. Pursuant to these Agreements, BNY was appointed the Funds' agent with full discretion to lend securities to a list of approved

---

[2] The facts in the background section are taken from the Funds' first amended complaint and the exhibits attached thereto and are presumed true for the purpose of resolving Defendants' motion to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

borrowers and invest the collateral in an agreed list of approved investments. BNY Mellon Corp., through its BNY Mellon Asset Servicing division, managed the Funds' cash investments.

Pursuant to the Agreements, in August and December 2006, Defendants purchased nearly $25 million of corporate floating rate notes issued by Lehman Brothers Holding Company, Inc. ("Lehman") on the Funds' behalf. These notes bore the CUSIP numbers 52517PL33 and 52517PQ53 (the "Lehman Notes"). Despite increasing uncertainty about Lehman's financial stability, as detailed below, Defendants did nothing to protect the Funds' investments, with the end result being that, when Lehman filed for bankruptcy on September 15, 2008, Defendants booked a $24.5 million deficiency to the Funds' collateral accounts. Although that deficiency was subsequently reduced by distributions from the Lehman bankruptcy estate and the sale of the Lehman Notes, the loss remained significant.

More specifically, between February and April 2007, the subprime mortgage industry collapsed, with various subprime mortgage lenders filing for bankruptcy. This caused S&P and Moody's to downgrade bonds and securities that were backed by subprime mortgages. The crisis continued, with then U.S. Treasury Secretary Hank Paulson warning against relying on rating agency ratings in view of the failures related to mortgage-backed securities in October 2007. In March 2008, Bear Stearns, then the nation's fifth largest investment bank, was bought by JP Morgan Chase at a fraction of its value, and in mid-July 2008, IndyMac Bank was placed into FDIC receivership. At that time, Bloomberg reported over $435 billion of write-downs and credit losses related to mortgage-backed securities, collateralized debt obligations, leveraged loans, and other fixed-income assets since January 2007.

Amidst this crisis, unbeknownst to the Funds but not to Defendants, Lehman's core businesses were severely impacted and intense speculation arose regarding Lehman's future. On

3

December 14, 2007, Punk Ziegel & Co. issued an analyst report recommending that Lehman's stock be avoided, as the outlook for its business was "not positive." *Id.* ¶ 62. On March 17, 2008, a column was published in the *Dow Jones Newswires* entitled "IN THE MONEY: Why Lehman May or May Not Be The Next Bear," which stated that "Lehman has sizable exposure to dicey mortgage securities and other hard-to-value instruments that could be a drag on its liquidity" and that Lehman held "$42 billion worth of 'Level 3' securities – illiquid, write-down-prone securities valued using Lehman's estimates and models instead of actual market data." *Id.* ¶ 64 (emphasis omitted).

Industry players also sounded warning bells about Lehman, with Moody's lowering its outlook on Lehman's rating, UBS downgrading Lehman stock from buy to neutral, and analysts noting that Lehman was undercapitalized. In June 2008, S&P downgraded its rating of the Lehman Notes from A+ to A, Fitch downgraded its rating from A+ to A--, and Moody's changed its rating outlook on Lehman from stable to negative. That same month, Lehman announced a second-quarter loss of $2.8 billion—higher than analysts expected—and its CFO and COO both resigned shortly thereafter. By July 2008, Lehman's stock price had dropped to less than $17 per share—a drop of more than 70% since January 2008. At the same time, however, because the Lehman Notes were still trading at close to par in July 2008, Defendants could have liquidated the Funds' holdings in Lehman at little if any loss, but they did not.

Other signs also signaled that holding onto the Lehman Notes was imprudent. In 2007, the cost of Lehman credit default swaps for one-year notes rose from $6 to $144 and reached approximately $700 in the first eight months of 2008. By late August 2008, it was reported that Lehman owned approximately $61 billion in mortgages and asset-backed securities and that its market capitalization had decreased to approximately $11 billion. On September 9, 2008,

4

Lehman's stock fell to $7.79 and S&P issued a negative watch on Lehman after a state-run South Korean firm put acquisition talks with Lehman on hold. The situation continued to deteriorate on a daily basis, even though the Lehman Notes continued to trade close to par value. Ultimately, Lehman filed for bankruptcy on September 15, 2008. Thereafter, Moody's downgraded Lehman's long term debt rating to B3 from A2, S&P from A to CCC-, and Fitch to default. The price of Lehman bonds fell further and, by September 18, 2008, they were trading at only 15% of par value.

Moreover, months before Lehman's bankruptcy filing, Defendants had removed Lehman from their approved borrowers list.[3] In a September 15, 2008, press release, Defendants made clear that they had eliminated their own exposure to Lehman by the time of the bankruptcy filing.[4] An after-the-fact independent investigation conducted by an examiner appointed by the bankruptcy court also revealed that, because of its position as one of Lehman's clearing banks, BNY knew of Lehman's deteriorating financial condition before Lehman filed for bankruptcy and took steps to protect its own interests. For example, by summer 2008, BNY was demanding collateral deposits from Lehman to secure intraday credit risk. Additionally, on August 20, 2008, BNY entered discussions with Lehman to minimize its exposure to Lehman's European commercial paper and medium term note programs, with BNY eventually allowing Lehman to open a money market account with BNY so as to maintain sufficient deposits to cover BNY's

---

[3] Defendants attached a copy of the Bank of New York Mellon Securities Lending List of Approved Borrowers as of September 1, 2008, which includes Lehman, to their motion to dismiss. Ex. 3 to Chan Decl. Although the Court may consider this document, as it is referred to in the Funds' first amended complaint and is central to their claims, *see Hecker v. Deere & Co.*, 556 F.3d 575, 582–83 (7th Cir. 2009), the Court nonetheless credits the Funds' allegation that Lehman was removed from the list at this stage because the document Defendants attached does not conclusively demonstrate that Lehman was not removed from the list at some earlier point.

[4] Defendants have attached this press release to their motion to dismiss, arguing that it does not support the Funds' allegation. The press release states that Defendants "have no outstanding loans to Lehman." Ex. 4 to Chan Decl. This statement, however, can plausibly be read to support the Funds' allegation.

forecasted intraday exposure to Lehman. Thus, on September 11, 2008, BNY received an initial deposit of $125 million from Lehman and held $170 million in collateral the day Lehman filed for bankruptcy. Despite Defendants' "specific knowledge and recognition of the growing risks to Lehman's viability – and, necessarily, the risks to investments in Lehman such as the Lehman Notes – and despite the multiple industry and media reports speculating about Lehman's future in 2007 and 2008, Defendants failed to do anything with respect to the Funds' investment in the Lehman Notes to eliminate or minimize the losses that ultimately materialized when Lehman declared bankruptcy." *Id.* ¶ 10.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In ruling on a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

# ANALYSIS[5]

## I. BNY Mellon Corp. as a Defendant

Defendants argue that BNY Mellon Corp. is not a proper party because it did not contract with the Funds and is not a fiduciary. *See Klosterman v. W. Gen. Mgmt., Inc.*, 32 F.3d 1119, 1122 (7th Cir. 1994) ("A claim for breach of fiduciary duties under ERISA is only valid against a 'fiduciary.' "). Under ERISA,

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). The term "fiduciary" is to be construed broadly, *Rogers v. Baxter Int'l, Inc.*, 417 F. Supp. 2d 974, 986 (N.D. Ill. 2006), and "a person may be a fiduciary for some purposes, but not for others," *Plumb v. Fluid Pump Serv., Inc.*, 124 F.3d 849, 854 (7th Cir. 1997). A person may be considered a functional fiduciary even if not so explicitly named if he falls within ERISA's definition of the term. *Rogers*, 417 F. Supp. 2d at 986.

Here, there is no dispute that based on the Agreements, BNY is a fiduciary. The Agreements do not mention BNY Mellon Corp., however, and thus the Court must determine if the Funds have properly alleged that BNY Mellon Corp. is a functional fiduciary. The Funds first allege that "BNY Mellon Corp., through its division BNY Mellon Asset Servicing, actually managed the [Funds'] investments." First Am. Compl. ¶ 40. The Funds further support their assertion that BNY Mellon Corp. is a fiduciary by tracking ERISA's definition of "fiduciary,"

---

[5] In their opening memorandum of law in support of their motion to dismiss, Defendants argued that plaintiffs' claims were time-barred. In reply, however, that argument was withdrawn. *See* Doc. 38 at 10 n.3. Thus, the Court will not address it here.

7

alleging that both BNY Mellon Corp. and BNY "exercised authority or control over the management or disposition of the assets of the Funds" and were fiduciaries "in their capacity as investment manager of the Funds' assets in the securities lending program," where they "managed, acquired, and disposed of the Funds' assets." *Id.* ¶¶ 43–44.

The determination of a defendant's fiduciary status, particularly whether one is a functional fiduciary, is typically premature at the motion to dismiss stage as it is a fact-intensive inquiry. *See, e.g.*, *Krukowski v. Omicron Techs., Inc.*, No. 10 C 5282, 2011 WL 1303416, at *6 (N.D. Ill. Mar. 31, 2011); *Patten v. N. Trust Co.*, 703 F. Supp. 2d 799, 808–09 (N.D. Ill. 2010); *George v. Kraft Foods Global, Inc.*, 674 F. Supp. 2d 1031, 1049–50 (N.D. Ill. 2009); *Porterfield v. Orecchio*, No. 07 C 3654, 2008 WL 130921, at *3 (N.D. Ill. Jan. 9, 2008); *Smith v. Aon Corp.*, No. 04 C 6875, 2006 WL 1006052, at *4 (N.D. Ill. Apr. 12, 2006). The Funds have sufficiently alleged for pleading purposes that BNY Mellon Corp. acted as a fiduciary. *See also Bd. of Trs. of S. Cal. IBEW-NECA Defined Contribution Plan v. The Bank of New York Mellon Corp.*, No. 09 Civ. 6273(RMB), 2011 WL 6130831 (S.D.N.Y. Dec. 9, 2011) (summary judgment decision involving similar claims against both BNY Mellon Corp. and BNY); *N.C. Dep't of State Treasurer v. The Bank of New York Mellon*, No. 12 CVS 3920, 2012 WL 5383312, at *3 (N.C. Super. Ct. Oct. 31, 2012) (denying motion for judgment on the pleadings that BNY Mellon Corp. was not proper party to litigation on similar basis). Because further factual development is necessary to test the Funds' allegations with respect to BNY Mellon Corp.'s status as a fiduciary, the Court cannot conclude that BNY Mellon Corp. should be dismissed as a party at this stage.[6]

---

[6] The Court has already found that the Funds have sufficiently alleged that BNY Mellon Corp. acted as a functional fiduciary and thus need not address the Funds' alternative argument raised in their response that they should be allowed to explore whether BNY Mellon Corp. can be held liable on a veil piercing theory. The Court notes, however, that such a theory is not viable as the complaint is currently pled. Generally, in order for veil piercing to be appropriate, a parent corporation must exercise near complete control over its subsidiary. *Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, No. 09 C 5619, 2010

## II. Breach of the Duties of Prudence and Loyalty

ERISA fiduciaries owe participants and beneficiaries a duty of loyalty. 29 U.S.C. § 1104(a)(1)(A). ERISA also requires fiduciaries to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). The ultimate loss that the Funds realized on the Lehman Notes does not, on its own, establish that Defendants breached their duty of care, for compliance with one's fiduciary duty "requires prudence, not prescience." *DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*, 920 F.2d 457, 465 (7th Cir. 1990) (citation omitted) (internal quotation marks omitted). Defendants argue that the Funds base their claims of imprudence only on such hindsight allegations. But the Funds have in fact included allegations based on information that was contemporaneously available to Defendants and the public in 2007 and 2008,[7] contending that this information should have demonstrated that holding onto the Lehman Notes was not prudent based on the changing circumstances. *See Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 734 (7th Cir. 2006) ("A trustee who simply ignores changed circumstances that have increased the risk of loss to the trust's beneficiaries is imprudent.").

---

WL 3940694, at *8 (N.D. Ill. Oct. 6, 2010). Although this is indeed a fact-intensive inquiry, *Nat'l Soffit & Escutcheons, Inc. v. Superior Sys., Inc.*, 98 F.3d 262, 265 (7th Cir. 1996), the Funds have not included any allegations in the first amended complaint that would support such a finding. Absent further amendment that would provide some basis for disregarding corporate form, the Funds' claims against BNY Mellon Corp. are restricted solely to a fiduciary theory. *See Nathan v. Morgan Stanley Renewable Dev. Fund, LLC*, No. 11 C 2231, 2012 WL 1886440, at *8 (N.D. Ill. May 22, 2012) (dismissing parties on motion to dismiss where plaintiffs' complaint did not include "factual allegations relevant to the determination of whether the court should disregard [the parent corporation's] corporate form"); *Pa. Chiropractic Ass'n*, 2010 WL 3940694, at *7–8 (finding that parent company could not be sued for alleged wrongs of its subsidiary based on veil piercing theory but providing plaintiff leave to amend to allege with more specificity the relationship between the parent and the subsidiary).

[7] Although some of this information is based on information the Funds have learned from the examiner's report published in 2010, the information on which the Funds rely from that report is information that they allege was available to Defendants in 2007 and 2008, not solely after the fact.

Defendants nonetheless argue that the "red flags" and other warning signs that the Funds have identified are insufficient to plausibly allege an imprudence claim, relying on the Second Circuit's recent decision in *Pension Benefit Guaranty Corp. ex rel. St. Vincent Catholic Medical Centers Retirement Plan v. Morgan Stanley Investment Management Inc.*, 712 F.3d 705 (2d Cir. 2013). Over a dissent, the majority in *St. Vincent* affirmed the dismissal of a pension plan administrator's breach of the duty of prudence claim, finding that the amended complaint did not allege any surrounding circumstances that would make plausible the inference that the securities at issue were no longer sound investments and "fail[ed] to connect the alleged 'warning signs' to any specific characteristics of the securities" at issue. *Id.* at 721–22. The *St. Vincent* majority acknowledged, however, that situations exist where an imprudence claim may survive a motion to dismiss "based solely on circumstantial factual allegations" and that the inquiry must be "context-specific." *Id.* at 727. The dissent criticized the majority for adopting a "heightened pleading standard" that "finds no support in the only guideposts that matter at the pleading stage: Rule 8 and the standards articulated by the Supreme Court in *Twombly* and *Iqbal*," contending instead that plaintiffs had adequately pleaded their claim. *Id.* at 731–32, 734 (Straub, J., dissenting) ("Where, as here, plaintiffs have identified the actions which were allegedly inappropriately risky, defendants are unquestionably on notice as to [the] basis of the claim at issue. The rules of notice pleading require nothing more.").

This Court agrees with the *St. Vincent* dissent that the majority there read *Twombly* and *Iqbal* too strictly and declines to impose a heightened pleading requirement on plaintiffs asserting ERISA imprudence claims, particularly where the Seventh Circuit has not adopted any such requirement. Moreover, even the *St. Vincent* majority acknowledged that whether an imprudence claim can proceed past a motion to dismiss is "context-specific" and noted that, in

10

the case before it, "imprecise pleading is particularly inappropriate . . . where the plaintiffs necessarily have access, without discovery, to plan documents and reports that provide specific information from which to fashion a suitable complaint." *Id.* at 723 (majority opinion). Here, Defendants do not argue that the Funds have access to the additional information that the plaintiffs in *St. Vincent* had so as to require more specific pleading from them. Thus, the Court further finds *St. Vincent*'s heightened pleading expectations inappropriate here.

In addition to pointing to the decrease in the value of the Lehman Notes after Lehman filed for bankruptcy, the Funds have detailed numerous warning signs that they allege should have caused Defendants to reconsider whether it was prudent to retain the Lehman Notes given the Funds' particular investment objectives.[8] At this stage, these allegations give rise to the plausible inference that Defendants breached their duty of prudence. "Whether plaintiffs can establish that these warning signs would have caused a reasonably prudent fiduciary to act differently than did defendants, or whether defendants are correct that plaintiffs are simply relying on 20/20 hindsight, is a question of fact that might possibly (but not likely) be resolved on summary judgment, but cannot be decided on a motion to dismiss." *La. Firefighters' Ret. Sys. v. N. Trust Invs., N.A.*, No. 09 C 7203, 2011 WL 1770266, at *4 (N.D. Ill. May 6, 2011); *see also Diebold ex rel. Exxon-Mobil Sav. Plan v. N. Trust Inv., N.A.*, No. 09 C 1934, 2010 WL 3700387, at *3 (N.D. Ill. Sept. 7, 2010) ("[W]hether a particular investment choice was imprudent is a particularly fact-sensitive inquiry that would not be appropriate to resolve on a motion to dismiss."); *IBEW*, 2011 WL 6130831, at *1, 3 (denying summary judgment on

---

[8] The Seventh Circuit has recognized that a fiduciary cannot be held liable for failure to use non-public information available to it, as this "would require insiders to engage in investment transactions on the basis of material nonpublic information, which would violate federal securities laws." *White v. Marshall & Ilsley Corp.*, 714 F.3d 980, 992 (7th Cir. 2013). The Funds may not rely on any information that would be considered insider information under the federal securities laws in their attempts to prove their breach of fiduciary duty claims.

11

imprudence claim based on allegation that Lehman Notes should have been sold prior to Lehman's bankruptcy). Additionally, because the Court finds that the Funds have properly alleged an imprudence claim and Defendants argue only that the duty of loyalty claim should be dismissed because it is derivative of the prudence claim, the Funds' breach of the duty of loyalty claim also survives.

### III. Violation of ERISA § 406

Section 406(b) prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1). The Funds have alleged that Defendants violated this section because, by investing in the Lehman Notes, which were more profitable for Defendants than other available and more suitable investments, they "placed their own profit motives ahead of the security and safety of the Funds' assets" and earned profits for themselves at the Funds' expense. First Am. Compl. ¶¶ 122–23. Defendants argue first that the mere fact that the investments paid a higher return than other unidentified investments cannot form the basis for a breach of § 406(b)(1), without citation to supporting case law. But at least one other court has allowed a similar claim to proceed, *see IBEW*, 2011 WL 6130831, at \*4–5, and the Court does not find Defendants' argument, without additional development, persuasive. Although the Funds will be required to provide factual support for their allegations to sustain this claim, they have sufficiently placed Defendants on notice of their claim.

Next, Defendants argue that the Funds' § 406 claim fails because it is not based on any actionable transaction. Defendants argue that the Funds are basing their claim on the absence of a transaction—Defendants' decision to retain the Lehman Notes rather than sell them. *See David v. Alphin*, 704 F.3d 327, 340–41 (4th Cir. 2013) (claims under § 406 require an affirmative act, such as the initial selection of funds, and cannot be based on "a decision to continue certain

investments, or a defendant's failure to act"). But the Court understands the Funds' claim to be that the initial selection of the Lehman Notes violated § 406 because that investment was more profitable for Defendants than other available investments. As this is a cognizable transaction, Defendants' argument is rejected, and the Funds may proceed to discovery on their § 406 claim.

## CONCLUSION

For the foregoing reasons, Defendants' motion [26] is denied. Defendants are ordered to answer the complaint by March 4, 2014. A status hearing is set for March 11, 2014 at 9:30 a.m.


Dated: February 6, 2014

SARA L. ELLIS
United States District Judge